**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. and the OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § § § § | |
| Plaintiffs, | § § | Case No. 3:11-cv-158 |
| v. | § § | |
| MIAMI HEAT LIMITED PARTNERSHIP, and BASKETBALL PROPERTIES, LTD., | § § § § | |
| Defendants. | § | |

_____

**ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.**

_____

**SUMMARY**

1.     The Court has ordered Receiver Ralph S. Janvey ("Receiver") to take control of all assets of the Receivership Estate in order to make an equitable distribution to claimants injured by a massive fraud orchestrated by R. Allen Stanford, James Davis, and others.

2.     The Receiver's investigation to date reveals that revenue from the sale of fraudulent certificates of deposit ("CD Proceeds") generated substantially all of the income for the Stanford Defendants and the many related Stanford Entities (collectively, the "Stanford Parties").

3.     Miami Heat Limited Partnership owns and manages the Miami Heat professional basketball team, and offers sports and entertainment services, including sports merchandise retailing and marketing services.

4.      Basketball Properties, Ltd. manages and operates the AmericanAirlines Arena in downtown Miami, Florida, which is the arena in which the Miami Heat plays its home games.

5.      The Receiver has identified payments of CD Proceeds totaling at least $1,319,125.45 from the Stanford Parties to Miami Heat Limited Partnership and Basketball Properties, Ltd. (collectively, the "Miami Heat Parties").  The payments to the Miami Heat Parties are related to Stanford's sponsorship, advertising and promotional activities with the Miami Heat Parties.

6.      Through this lawsuit, the Receiver and the Official Stanford Investors Committee (the "Committee," and collectively with the Receiver, the "Plaintiffs") seek the return of the CD Proceeds received directly or indirectly by the Miami Heat Parties in order to make an equitable distribution to claimants.[1]  The Receiver's investigation is continuing, and should more payments of CD Proceeds to the Miami Heat Parties be discovered, the Plaintiffs will amend this Complaint to assert claims regarding such additional payments.

7.      The Miami Heat Parties either performed no services for the CD Proceeds they received; performed services that did not constitute reasonably equivalent value in exchange for the CD Proceeds they received; or performed only services that were in furtherance of the Ponzi scheme, which cannot be reasonably equivalent value as a matter of law.  The Miami Heat Parties, further, cannot establish that they are good-faith transferees.

8.      At all times relevant to this complaint, the Stanford Parties were insolvent, and Defendant R. Allen Stanford operated the Stanford entities in furtherance of his fraudulent scheme.  Each payment of CD Proceeds from the Stanford Parties to the Miami Heat Parties was made with actual intent to hinder, delay, and defraud the Stanford Parties' creditors.

---

[1]      The Plaintiffs' claims in this Complaint are related to claims on file in Case No. 03:09-CV-0724-N before this Court.  Pursuant to Local Rule 3.3(a), the Plaintiffs have filed a notice of related case concurrently with this Complaint.

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

2

9.    The Receiver was only able to discover the fraudulent nature of the above-referenced transfers after R. Allen Stanford and his accomplices were removed from control of the Stanford entities and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Stanford entities.

10.    The Plaintiffs seek an order that: (a) CD Proceeds received directly or indirectly by the Miami Heat Parties were fraudulent transfers under applicable law or, in the alternative, unjustly enriched the Miami Heat Parties; (b) CD Proceeds received directly or indirectly by the Miami Heat Parties are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Miami Heat Parties are liable to the Plaintiffs for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Plaintiffs.

## JURISDICTION & VENUE

11.    This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

12.    Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

13.    Further, within 10 days of the entry of the Order and Amended Orders Appointing Receiver, the Receiver filed the original SEC Complaint and the Order Appointing Receiver in the United States District Court for the Southern District of Florida and the United States District Courts for the districts in Texas pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in those districts and every other district where the Complaint and Order have been filed.

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

3

14.     This Court has personal jurisdiction over the Miami Heat Parties pursuant to FED. R. CIV. P. 4(k)(1)(C); and 15 U.S.C. §§ 754 and 1692.

15.     Further, this Court has personal jurisdiction over the Miami Heat Parties because the Miami Heat Parties regularly conduct business in Texas, and have engaged in continuous and systematic activities within Texas, including but not limited to participation in professional basketball games in San Antonio, Dallas, and Houston, and marketing and merchandising efforts related to the Miami Heat brand throughout the State of Texas.

## THE PARTIES

16.     Plaintiff Ralph S. Janvey has been appointed by this Court as the Receiver for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, R. Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities the foregoing persons and entities own or control, including, but not limited to SFGGM and SFGC (the "Receivership Assets").   Plaintiff Janvey is asserting the claims contained herein in his capacity as Court-appointed Receiver.

17.     Plaintiff Official Stanford Investors Committee was formed by this Court on August 10, 2010.   *See* Case No. 3:09-CV-0298-N, Doc. 1149 (the "Committee Order").   As stated in the terms of the Committee Order, the Committee, through this Complaint, is cooperating with the Receiver in the identification and prosecution of actions and proceedings against the Miami Heat Parties for the benefit of the Receivership Estate and the Stanford

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

4

Investors.  *See id.* at ¶ 8; *see also id.* at ¶ 7 (authorizing the Receiver and the Committee to bring litigation jointly).

18.     Defendant Miami Heat Limited Partnership is a Florida limited partnership with a principal office in Miami, Florida.  Miami Heat Limited Partnership will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

19.     Defendant Basketball Properties, Ltd. is a Florida limited partnership with a principal office in Miami, Florida.  Basketball Properties, Ltd. will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

## STATEMENT OF FACTS

20.     On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. "Jim" Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd. ("SIB," "SIBL," or "the Bank"), Stanford Group Company, and Stanford Capital Management, LLC (collectively the "Stanford Defendants").  On the same date, the Court signed an Order appointing a Receiver, Ralph S. Janvey, over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

## I.     *The Stanford Defendants Operated a Ponzi Scheme.*

21.     As alleged by the SEC, the Stanford Defendants marketed fraudulent SIB CDs to investors through SGC financial advisors pursuant to a Regulation D private placement.  SEC's Second Amended Complaint (Doc. 952), ¶ 27.[2]  The CDs were sold by Stanford International Bank, Ltd.  *Id.*

---

[2]     Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Stanford Int'l Bank, Ltd., et al.,* Civil Action No. 3-09-CV-0298-N.

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

5

22.     The Stanford Defendants orchestrated and operated a wide-ranging Ponzi scheme. Stanford Defendant James M. Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning.  Doc. 771 (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); Doc. 807 (Davis Tr. of Rearraignment) at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme ab initio").  In fact, this Court recently found that the Stanford fraud was indeed a Ponzi scheme. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), and at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . .").

23.     In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's findings that the Stanford fraud was a Ponzi scheme.  *See Janvey v. Alguire*, No. 10-10617, 2010 WL 5095506, at *1, *17 (5th Cir. Dec. 15, 2010) (upholding this Court's Order).  In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> \*       \*       \*
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*.
>
> \*       \*       \*
>
> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . . .
>
> \*       \*       \*

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

6

Here, the Receiver provided evidence of a massive Ponzi scheme . . . .  The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized.

*Id.* at *9-13.

24.     In marketing, selling, and issuing CDs to investors, the Stanford Defendants repeatedly touted the CDs' safety and security and SIB's consistent, double-digit returns on its investment portfolio.  SEC's Second Amended Complaint (Doc. 952), ¶¶ 32-33.

25.     In its brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit."   SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers."  *Id*. ¶ 34.  Further, SIB stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."  *Id*.

26.     In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements."  *Id*. ¶ 35.  More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments.  *Id*.

27.     Consistent with its Annual Reports and brochures, SIB trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients."  *Id*. ¶ 36.  In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993).  *Id*. ¶ 49.

28.     Contrary to the Stanford Defendants' representations regarding the liquidity of SIB's portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

7

securities."   Instead, significant portions of the Bank's portfolio were misappropriated by the Stanford Defendants and were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" – *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit cards, etc.).   In fact, at year-end 2008, the largest segments of the Bank's portfolio were private equity; over-valued real estate; and at least $1.6 billion in undocumented "loans" to Defendant R. Allen Stanford.  *See id.* ¶¶ 39-40.

29.    In an effort to conceal their fraud and ensure that investors continued to purchase the CDs, the Stanford Defendants fabricated the performance of SIB's investment portfolio.  *Id.* ¶ 4.

30.    SIB's financial statements, including its investment income, were fictional.  *Id.* ¶¶ 4, 53.  In calculating SIB's investment income, Stanford Defendants R. Allen Stanford and James Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio.   *Id.*   Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn.  *Id.*

31.    For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing CDs.  *See id.* ¶ 1.  However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses.  As the depletion of liquid assets accelerated, this fraudulent Ponzi scheme collapsed.

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

8

32.     Most of the above facts discovered from Stanford's records have since been confirmed by Stanford's Chief Financial Officer, James Davis, who has pleaded guilty to his role in running the Stanford Ponzi scheme.

**II.     The Stanford Parties Transferred CD Proceeds from the Ponzi Scheme to the Miami Heat Parties.**

33.     CD Proceeds from the Ponzi scheme described above were transferred by or at the direction of the Stanford Parties to the Miami Heat Parties.  The Miami Heat Parties did not provide reasonably equivalent value for the transfers of CD Proceeds to them and cannot establish that they are good-faith transferees.

34.     The Receiver has identified payments of CD Proceeds totaling at least $1,319,125.45 from the Stanford Parties to the Miami Heat Parties.  The payments to the Miami Heat Parties are related to Stanford's sponsorship, advertising and promotional activities with the Miami Heat Parties.

35.     The transfers of CD Proceeds to the Miami Heat Parties from the Stanford Parties consisted of at least the following: $317,717.50 in 2006; $504,663.91 in 2007; and $496,744.04 in 2008.  *See* App.[3] at 1 (listing the dates and amounts of payments to the Miami Heat Parties from the Stanford Parties).  The Receiver's investigation is continuing, and should more payments of CD Proceeds to the Miami Heat Parties be discovered, the Plaintiffs will amend this Complaint to assert claims regarding such additional payments.

### REQUESTED RELIEF

36.     This Court appointed Ralph S. Janvey as Receiver for the Receivership Assets.  Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2; Second Amended Order Appointing Receiver (Doc 1130) at ¶¶ 1-2.   The Court

---

[3]     The Appendix in Support of this Complaint is referred to herein as the "Appendix" or by the abbreviation "App."  The Appendix is incorporated by reference into this Complaint.

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

9

appointed the Committee to represent Stanford investors in the case *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-CV-0298-N and in related matters. Committee Order (Doc. 1149) at ¶ 2. The Plaintiffs seek the relief described herein in these capacities.

37. Paragraph 4 of the Order Appointing Receiver, signed by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing Receiver (Doc. 157) at ¶ 4; Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 4. Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order Appointing Receiver (Doc. 157) at ¶ 5(c); Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(c); *see also Alguire*, 2010 WL 5095506, at *16-17 ("[R]eceivers are legal hybrids, imbued with rights and obligations analogous to the various actors required to effectively manage an estate in the absence of the 'true' owner. . . . [R]eceivers have long held the power to assert creditor claims.").

38. One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants. *See* Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.*, 147

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

10

F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660, 669 (D. Kan. 2004).  But before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Estate or assets traceable to the Estate. *See* Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(b).

39.     The Committee Order, signed by the Court on August 10, 2010, states that "[t]he Committee shall have rights and responsibilities similar to those of a committee appointed to serve in a bankruptcy case under title 11 of the United States Code" and that the Committee may bring actions for the benefit of the Receivership Estate and the Stanford Investors jointly with the Receiver.  *See* Committee Order (Doc. 1149) at ¶¶ 2, 7-8.

### COUNT I:     *The Plaintiffs are Entitled to Disgorgement of CD Proceeds Fraudulently Transferred to the Miami Heat Parties.*

40.     The Plaintiffs are entitled to disgorgement of the CD Proceeds transferred from the Stanford Parties to the Miami Heat Parties because such payments constitute fraudulent transfers under applicable law.  The Stanford Parties made the payments to the Miami Heat Parties with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, the Plaintiffs are entitled to the disgorgement of those payments.  Additionally, the Stanford Parties transferred the funds to the Miami Heat Parties at a time when the Stanford Parties were insolvent, and the Stanford Parties did not receive reasonably equivalent value in exchange for the transfers.

41.     The Plaintiffs may avoid transfers made with the actual intent to hinder, delay, or defraud creditors.  "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Alguire*, 2010 WL 5095506, at *9 ("[A] Ponzi scheme 'is, as a matter of law, insolvent from its

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

11

inception.'"); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception . . . .  The Receiver's proof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").

42.     The Stanford Parties were running a Ponzi scheme and paid the Miami Heat Parties with funds taken from unwitting SIB CD investors.  The Plaintiffs are, therefore, entitled to disgorgement of the CD Proceeds the Stanford Parties fraudulently transferred to the Miami Heat Parties.

43.     Consequently, the burden is on the Miami Heat Parties to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value.  *See* Case No. 3:09-CV-0724-N, Doc. 456 at 13 ("A defendant invoking this defense has the burden to show *both* objective good faith and reasonable equivalence of consideration.") (emphasis in original); *see also Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly.").  The Plaintiffs are, therefore, entitled to recover the full amount of the payments that the Miami Heat Parties received — either directly or indirectly — unless they prove *both* objective good faith *and* reasonably equivalent value.

44.     The good-faith element of this affirmative defense requires that the Miami Heat Parties prove objective, rather than subjective, good faith.  *See Warfield*, 436 F.3d at 559-560 (good faith is determined under an "objectively knew or should have known" standard); *In re IFS Fin. Corp.*, Bankr. No. 02-39553, 2009 WL 2986928, at *15 (Bankr. S.D. Tex. Sept. 9, 2009) (objective standard is applied to determine good faith); *Quilling v. Stark*, No. 3-05-CV-1976-BD, 2007 WL 415351, at *3 (N.D. Tex. Feb. 7, 2007) (good faith "must be

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

12

analyzed under an objective, rather than a subjective, standard.  The relevant inquiry is what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.") (internal citations and quotation marks omitted).

45.     There is no evidence that the Miami Heat Parties provided any value — much less reasonably equivalent value — in exchange for the fraudulent transfers they received.  Moreover, both this Court and the Fifth Circuit have held that providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value.  *Warfield*, 436 F.3d at 555, 560; Case No. 3:09-CV-0724-N, Doc. 456 at 13-14 ("[A]s a matter of law, services provided in the context of a Ponzi scheme do not constitute 'reasonably equivalent value.'").  Furthermore, consideration which has no utility from the creditor's perspective does not satisfy the statutory definition of "value."  *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000).  The Miami Heat Parties cannot now claim that, in return for furthering the Ponzi scheme and helping it endure, they should be entitled to keep the over $1.3 million in CD Proceeds they received from the Stanford Parties.  Because the Miami Heat Parties cannot meet their burden to establish that they provided reasonably equivalent value for the payments of CD Proceeds to them, the Plaintiffs are entitled to the disgorgement of those funds.

46.     Moreover, under applicable fraudulent-transfer law, the Plaintiffs are entitled to attorneys' fees and costs for their claims against the Miami Heat Parties.  *See, e.g.,* TEX. BUS. & COM. CODE ANN. § 24.013 ("[T]he court may award costs and reasonable attorney's fees as are equitable and just.").  As a result, the Plaintiffs request reasonable attorneys' fees and costs for prosecuting their fraudulent-transfer claims against the Miami Heat Parties.

47.     The Miami Heat Parties cannot meet their burden to establish that they provided reasonably equivalent value for the CD Proceeds they directly or indirectly received from the

Stanford Parties and that they received such payments in good faith.  Accordingly, the Plaintiffs are entitled to the disgorgement of those funds.

48.    In order to carry out the duties delegated to them by this Court, the Plaintiffs seek complete and exclusive control, possession, and custody of the CD Proceeds received by the Miami Heat Parties.

49.    The Receiver was only able to discover the fraudulent nature of the above-referenced transfers after R. Allen Stanford and his accomplices were removed from control of the Stanford entities, and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Stanford entities.  Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period.  *See*, *e.g.*, *Wing v. Kendrick*, No. 08-CV-01002, 2009 WL 1362383, at *3 (D. Utah May 14, 2009); *Quilling v. Cristell*, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 29, 2006); *see also* Tex. Bus. & Comm. Code Ann. § 24.010(a)(1) (claims may be brought either within four years of the transfer *or* "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

50.    The Stanford Parties, who orchestrated the Ponzi scheme, transferred the CD Proceeds to the Miami Heat Parties with actual intent to hinder, delay, or defraud their creditors. The Plaintiffs are, therefore, entitled to disgorgement of all CD Proceeds fraudulently transferred to the Miami Heat Parties.  Pursuant to the equity powers of this Court, the Plaintiffs seek an order that: (a) CD Proceeds received directly or indirectly by the Miami Heat Parties were fraudulent transfers under applicable law; (b) CD Proceeds received directly or indirectly by the Miami Heat Parties are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Miami Heat Parties are liable to the Plaintiffs

Original Complaint Against
Miami Heat Limited Partnership and Basketball Properties, Ltd.

14

for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Plaintiffs.

> **COUNT II: In the Alternative, the Plaintiffs are Entitled to Disgorgement of CD Proceeds from the Miami Heat Parties under the Doctrine of Unjust Enrichment.**

51.     In the alternative, the Plaintiffs are entitled to disgorgement of the CD Proceeds paid to the Miami Heat Parties pursuant to the doctrine of unjust enrichment under applicable law.  The Miami Heat Parties received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors.  The Miami Heat Parties have been unjustly enriched by such funds, and it would be unconscionable for them to retain the funds.

52.     In order to carry out the duties delegated to them by this Court, the Plaintiffs seek complete and exclusive control, possession, and custody of the CD Proceeds received by the Miami Heat Parties.

53.     The Miami Heat Parties have been unjustly enriched by their receipt of CD Proceeds from the Stanford Parties.  The Plaintiffs are, therefore, entitled to disgorgement of all CD Proceeds the Miami Heat Parties received.  Pursuant to the equity powers of this Court, the Plaintiffs seek an order that: (a) CD Proceeds received directly or indirectly by the Miami Heat Parties unjustly enriched the Miami Heat Parties; (b) CD Proceeds received directly or indirectly by the Miami Heat Parties are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Miami Heat Parties are liable to the Plaintiffs for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Plaintiffs.

## PRAYER

54.     The Plaintiffs respectfully request an Order providing that:

Original Complaint Against
Miami Heat Limited Partnership and Basketball Properties, Ltd.

15

(a)  CD Proceeds received directly or indirectly by the Miami Heat Parties were fraudulent transfers under applicable law or, in the alternative, unjustly enriched the Miami Heat Parties;

(b)  CD Proceeds received directly or indirectly by the Miami Heat Parties are property of the Receivership Estate;

(c)  CD Proceeds received directly or indirectly by the Miami Heat Parties are subject to a constructive trust for the benefit of the Receivership Estate;

(d)  The Miami Heat Parties are liable to the Plaintiffs for an amount equaling the amount of CD Proceeds they directly or indirectly received;

(e)  The Plaintiffs are awarded attorneys' fees, costs, and prejudgment and post-judgment interest; and

(f)  The Court grants such other and further relief as the Court deems proper under the circumstances.

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

16

Dated:  January 25, 2011                          Respectfully submitted,

                                                  BAKER BOTTS L.L.P.

                                                  By:  /s/ Kevin M. Sadler
                                                      Kevin M. Sadler
                                                      Texas Bar No. 17512450
                                                      kevin.sadler@bakerbotts.com
                                                      Robert I. Howell
                                                      Texas Bar No. 10107300
                                                      robert.howell@bakerbotts.com
                                                      David T. Arlington
                                                      Texas Bar No. 00790238
                                                      david.arlington@bakerbotts.com
                                                      1500 San Jacinto Center
                                                      98 San Jacinto Blvd.
                                                      Austin, Texas 78701-4039
                                                      (512) 322-2500
                                                      (512) 322-2501 (Facsimile)

                                                      Timothy S. Durst
                                                      Texas Bar No. 00786924
                                                      tim.durst@bakerbotts.com
                                                      2001 Ross Avenue
                                                      Dallas, Texas 75201
                                                      (214) 953-6500
                                                      (214) 953-6503 (Facsimile)

                                                  ATTORNEYS FOR
                                                  RECEIVER RALPH S. JANVEY

**MORGENSTERN & BLUE, LLC**

By:  /s/ Peter D. Morgenstern

Peter D. Morgenstern (*admitted pro hac vice*)
pmorgenstern@mfbnyc.com
885 Third Avenue
New York, New York 10022
(212) 750-6776
(212) 750-3128 (Facsimile)

**ATTORNEYS FOR
THE OFFICIAL STANFORD INVESTORS COMMITTEE**

**CASTILLO SNYDER, P.C.**

By:  /s/ Edward C. Snyder

Edward C. Snyder
Texas Bar No. 00791699
esnyder@casnlaw.com
Bank of America Plaza, Suite 1020
300 Convent Street
San Antonio, Texas 78205
(210) 630-4200
(210) 630-4210 (Facsimile)

**ATTORNEYS FOR
THE OFFICIAL STANFORD INVESTORS COMMITTEE**

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

18

## CERTIFICATE OF SERVICE

On January 25, 2011, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve Miami Heat Limited Partnership and Basketball Properties, Ltd. individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler

ORIGINAL COMPLAINT AGAINST
MIAMI HEAT LIMITED PARTNERSHIP AND BASKETBALL PROPERTIES, LTD.

19